209 F.Supp. 83 (1962)
NATIONWIDE MUTUAL INSURANCE COMPANY, a Corporation, Plaintiff,
v.
STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, a Corporation, Ronald R. Osbourn, Kenneth D. Ramsey, Stanley Wagner, Individually and as Administrator of the Estate of Wilma Jean Wagner, Deceased, Wanna Mae Hornbeck Beer, as Administratrix of the Estate of Cheryl Hornbeck, Deceased, and as Duly Appointed Guardian of Karen Lynn Hornbeck, an infant, and Karen Lynn Hornbeck, Defendants.
Civ. A. No. 364-E.
United States District Court N. D. West Virginia.
September 7, 1962.
As Revised on Rehearing October 1, 1962.
Russell L. Furbee, Thomas J. Whyte, (Furbee & Hardesty, Fairmont, W. Va.) *84 and James H. Coleman, Jr., Buckhannon, W. Va., for plaintiff Nationwide Mutual Insurance Company.
Jacob S. Hyer (Hyer, Gibson & Talbott, Elkins, W. Va.), Myron B. Hymes, Gilbert Coonts (Hymes & Coonts, Buckhannon, W. Va.), for defendant State Farm Mutual Automobile Insurance Company.
Bonn Brown, Elkins, W. Va., for defendant, Ronald R. Osbourn.
John A. Cain, Elkins, W. Va., and John A. Mosesso, Philippi, W. Va., for defendant Wanna Mae Hornbeck Beer, as Administratrix and Guardian.
John A. Cain, Elkins, W. Va., for James L. Beer.
L. Baker Fowler, Elkins, W. Va., for defendant Stanley Wagner, Individually and as Administrator.
CHARLES F. PAUL, District Judge.
In this case, the plaintiff, Nationwide, seeks declaratory judgments determining the fact, order and apportionment of coverage of three automobile liability insurance policies with respect to claims of certain of the defendants growing out of an automobile accident which occurred November 9, 1960, in Upshur County, West Virginia.
Karen Lynn Hornbeck, age 17, who lived with her mother, Wanna Mae Hornbeck Beer, and her stepfather, James L. Beer, was driving a car owned by the defendant, Stanley Wagner, when it collided with a car owned and driven by the defendant, Kenneth D. Ramsey, with the defendant, Ronald R. Osbourn, as his passenger. In the collision, Cheryl Lee Hornbeck, age 15 and the sister of Karen, and Wilma Jean Wagner, age 15 and the daughter of the defendant, Stanley Wagner, passengers in the Wagner car driven by Karen, were killed. Osbourn and Ramsey suffered severe personal injuries, and the Ramsey car was demolished. Karen was severely injured and hospitalized for about one month. That day, at school, Cheryl (who was staying at the Wagner house) and Wilma Jean conceived the idea that they would like to visit several places in Buckhannon and drive around, if they could get the use of the Wagner car. On several previous occasions Stanley Wagner had permitted his car to be used for similar purposes when driven by one, Vera Gregory, age 16 and a licensed driver. On at least some of these occasions, Stanley Wagner had admonished Vera Gregory not to permit anybody else to drive the car. The two young girls first approached Vera Gregory with their proposal, and learned to their dismay that Vera had a date for that night. Not completely frustrated by this information, the girls approached Cheryl's sister, Karen, and obtained her agreement to drive the car. Karen was licensed to drive but Stanley Wagner did not know her except by sight, and had never entrusted his car or his daughter to her driving. The girls concocted a plan to get Wagner's consent to the use of his car, with Vera Gregory as the driver, have her drive them to their first planned stop (a drive-in restaurant) on the outskirts of Buckhannon, where she would meet her "date", and then have Karen take over the driving duties. In pursuance of their small (but fatal) deception, they asked Stanley Wagner for the use of the car with Vera Gregory as the driver. They told him that they were going to pick up Karen, but omitted to tell him that their plan was to have Karen do the major portion of the driving. Having granted the permission, Stanley Wagner drove the car, with the two young girls, to Vera Gregory's home, picked her up and drove back to his own home, where he turned over the driving to Vera Gregory.
Vera Gregory and the two girls then drove to the Beer home, picked up Karen, and proceeded to the drive-in restaurant, where, at about 7:10 P. M., Vera left the car with the other three girls in it (Karen in the front seat) and the ignition key in the lock. Vera met her date and went off with him in his car. The three girls, with Karen driving, followed Vera and her boy friend down the road and, pursuant to their plans, drove to a place called the Kollege Kitchen, in Buckhannon, *85 a place frequented by teenagers and young college students bent on refreshment and dancing to the music of a juke box. After staying there for a relatively short while, the girls went for a drive in and around Buckhannon. They proceeded out the State Route toward Clarksburg, and, at a point approximately two miles from Buckhannon, the accident occurred. The record is silent as to the time of the accident.
By stipulation of counsel, it was agreed that the case would be submitted upon depositions and briefs. The deposition of Vera Gregory could not be obtained, and counsel further stipulated that two signed but unsworn statements by her (one given to each of the insurance companies) should be made part of the record and considered in lieu of her deposition. The findings of fact are gained from these depositions and undisputed allegations in the pleadings. In her statements Vera Gregory denies knowledge of the fact that the girls had arranged for Karen Hornbeck to drive after she, Vera, left the car; explains her having left the key in the car as being for the convenience of the girls in operating the motor so that the heater would work for their comfort while sitting in the car at the drive-in restaurant; and asserts that she had arranged to return to the drive-in and pick the girls up about 9 o'clock. She says she did so return shortly after 9, and, of course, found the car and the girls gone. If it were of any importance, the court would find it hard to give credence to this statement of lack of knowledge on the part of Vera Gregory, in view of all of the circumstances. However, the point does not seem material and neither of Vera Gregory's statements is considered a material part of the testimony in this case. Claims have been made against Karen Hornbeck on behalf of the injured persons and the personal representatives of the deceased girls, and, at least upon some of the claims, suits have been filed. Proceedings in the cases in suit have been stayed pending disposition of this case.
The claimants allege that Karen's liabilities for personal injuries, death and property damage are covered by three policies of insurance: (1) A policy issued by State Farm to "Robert S. Wagner" on the car which Karen was driving, with limits of $20,000.00 for each person, $100,000.00 for each occurrence, and $20,000.00 property damage; (2) a policy issued by State Farm to James L. Beer on a Mercury car owned by him, with limits of $10,000.00 for each person, $20,000.00 for each occurrence, and $5,000.00 property damage; (3) a policy issued by Nationwide to Wanna Mae Hornbeck Beer covering a Chevrolet car owned by her, with limits of $20,000.00 for each person, $40,000.00 for each occurrence, and $5,000.00 property damage. Nationwide admits coverage by its policy but alleges that the State Farm coverages are primary and its coverage is excess. State Farm denies coverage under either of its policies, and takes the position that, if there is coverage by either policy, it should be prorated with that of Nationwide.

SECTION I.
We will first consider the question of coverage under the State Farm-Wagner policy. The claim of coverage is based upon the policy definition of the word "Insured". The policy provides that "(t)he unqualified word `Insured' includes (1) the named Insured, and also includes * * * (3) any other person while using the automobile, provided the actual use of the automobile is with the permission of the named Insured,". The contention is that Karen's driving of the automobile was in furtherance of a use of the car which had been permitted by the owner and named Insured.
The cases which consider the question of liability of an insurance company when the bailee or "first permittee" of an automobile entrusts the driving to someone else are legion. The cases which find coverage in the absence of an express or specific authorization from the owner to the "second permittee" fall into two main classifications.
*86 The first classification concerns factual situations in which the owner has entrusted the car to the first permittee to use virtually as his own, without restrictions as to the times or manner of use. Illustrative of cases of this type are: National Grange Mutual Liability Company v. Metroka (3 Cir. 1958), 250 F.2d 933; Persellin v. State Auto Ins. Ass'n., 75 N.D. 716, 32 N.W.2d 644 (1948); Indiana Lumbermen's Mut. Ins. Co. v. Janes (5 Cir. 1956), 230 F.2d 500; Schimke by Menn v. Mutual Auto Ins. Co. of Town of Herman, 266 Wis. 517, 64 N.W.2d 195 (1954); Hardware Mut. Cas. Co. v. Mitnick, 180 Md. 604, 26 A.2d 393 (1942). These cases imply authorization or permission from the owner to the driver.
The second main line of cases involves factual situations in which the authority of the first permittee was less general, and in certain of them where he had been specifically denied authority to let others drive, but in which the purpose for which the car was being used was within the specific permission and the first permittee was in the car at the time of the occurrence. The opinions in many of these cases take large comfort from the language of Judge Cardozo in the case of Grant v. Knepper, 245 N.Y. 158, 156 N.E. 650, 54 A.L.R. 845 (1927), to the effect that the first permittee, remaining in the car, was still "master of the ship", "director of the enterprise" and similar language. Further illustrative of this line of cases are: Maryland Casualty Co. v. Marshbank (3 Cir. 1955), 226 F.2d 637; Glens Falls Indemnity Co. v. Zurn (7 Cir. 1937), 87 F.2d 988; Brooks v. Delta Fire & Casualty Co., 82 So.2d 55 (La.App.1955); Brown v. Kennedy, 141 Ohio 457, 48 N.E.2d 857 (1942).
It is clear that our case does not fit the factual situations in either of these two lines of cases. Not only was Vera Gregory's authority to use the car restricted and limited to this particular purpose on this one occasion, but if anything can be implied from all of the circumstances, it must be implied that she not only had no authority, but that she was specifically forbidden, to entrust the driving to another. Certainly, the girls believed that if Stanley Wagner had known that Karen Hornbeck was going to drive, he would have denied permission to use the car; otherwise, they would not have been so careful to conceal their plans, and in the face of this, it would be strange, indeed, if the court should imply consent and authority running from Stanley Wagner to Karen Hornbeck. It is also clear that Vera Gregory was no longer "master of the ship" after she turned over the car to Karen.
In these respects our case resembles more closely the factual situation in Farmer v. Fidelity & Casualty Co. of N. Y. (4 Cir. 1957), 249 F.2d 185, in which coverage was denied.
While recognizing that our factual situation does not fall within the two main lines, counsel for Nationwide asks that we adopt the ratio decidendi of the New Jersey court in Indemnity Ins. Co. of North America v. Metropolitan Cas. Co. of N. Y., 33 N.J. 507, 166 A.2d 355 (1960). Parenthetically, it may be noted that the factual situation in the New Jersey case fits the second line of decisions noted above in that the use was authorized and the first permittee was in the car at the time of the accident. Disdaining to decide the case in accordance with this line of authorities, the New Jersey court chose to base its finding of coverage on the holding that it is not necessary to find either express or implied permission or authority running from the owner to the driver; that the necessary permission must be found only with respect to the use and not to the driver. The New Jersey court stresses a so-called liberal attitude, reflected by the financial responsibility statutes of the State of New Jersey, N.J.S.A. 39:6-23 et seq., 92 et seq., and urges the necessity for its liberal interpretation of the policy language in order to give effect to the public policy of that State. Nationwide's counsel urges that this court find a similar liberal policy for the State of West Virginia, and apply the language of the New Jersey court to the differing factual *87 situation here involved. The argument is that permission to use the car was given for the general purpose of "pleasure" of the owner's daughter and her friends. The argument loses sight of the fact that, for this purpose, Stanley Wagner furnished a car and a driver, in whom he had confidence. If the girls had chosen to use another car than that provided, there would have been no question of coverage, but counsel would have us find that it should make a difference that the girls chose a substitute not for the car, but for that more important element of the father's permission, the driver.
In urging this court to adopt for West Virginia the language of the New Jersey court as enunciating a rule that the court and jury should be free of the necessity of finding permission, either express or implied, running from the owner to the driver, to effectuate the State's public policy, Nationwide's counsel cite no West Virginia authority, either statutory or decisional. It is certain that, unlike the apparent support found in the New Jersey statutes, the West Virginia "Safety Responsibility Law" furnishes no support for the enunciation of this liberal policy. That law, in referring to "Motor Vehicle Liability Policy" (Michie's Code 1955, § 1721(521) (b) (2) (17D-4-12 (b) (2)) provides that such policies "Shall insure the person named therein and any other person, as insured, using any such vehicle * * * with the express or implied permission of such named insured, * * *." (Emphasis supplied). No broad policy dispensing with the necessity of a finding of permissive use by the driver can be gleaned from this language. As far as case law is concerned, the only West Virginia authority which our own research has developed is the case of Adkins v. Inland Mut. Ins. Co., 124 W.Va. 388, 20 S.E.2d 471, (1942). In this case, although the first permittee was in the car at the time of the accident, he was in a "passed out" condition from intoxication, and the court found that the elements of direction and control necessary to bring the case within the second line of decisions hereinbefore discussed, were lacking and denied coverage. Certainly, this case lends no support to Nationwide's position. In fact, for this court to adopt Nationwide's position as the law of West Virginia would require it to find that the Adkins case is no longer law.
Nationwide's contention that it is the use to which the vehicle is being put and not the operation by any particular driver which is determinative, finds some support in the language of the opinion in Standard Accident Insurance Co. v. New Amsterdam Casualty Co. (7 Cir. 1957), 249 F.2d 847. In that case, as in the New Jersey case, the first permittee was in the car at the time of the accident, and the factual situation would fit into the second line of decisions. However, the Seventh Circuit Court of Appeals, applying or interpreting Illinois law, emphasizes that the "use" being made of the car was that authorized by the owner, and finds a liberal "trend" in Illinois based upon the fact that the State cases put Illinois within the most liberal of the three possible alternatives in regard to whether the fact that a deviation from the purposes for which a bailment of a car was made avoids coverage. West Virginia, on the contrary, takes the middle position that anything more than a slight deviation will relieve the insurer. See Collins v. New York Cas. Co., 140 W.Va. 1, 82 S.E.2d 288 (1954).
Being unwilling to make new law for the State of West Virginia in conflict with the case law of the State courts and the expressions of the State Legislature, this court is unable to adopt the position of Nationwide. Under the facts in this case, Karen Hornbeck did not have the permission of Stanley Wagner, either express or implied, to drive Wagner's car, and Karen Hornbeck is not an insured under State Farm's policy on the Wagner car. This finding obviates the necessity of considering whether, as between the Wagner policy and the other two policies, the Wagner policy is primary or requires proration.

*88 SECTION II.
Turning now to the problems presented with reference to the coverage of Karen Hornbeck under the State Farm policy insuring the James L. Beer car:
Coverage is based upon the language of the policy defining "Insured" to include the relatives of the "Named Insured" and defining "relative" as follows: "Relative  means a relative of the Named Insured who is a resident of the same household." State Farm does not contend that Karen Hornbeck fails to meet these definitions, but denies coverage on the grounds that the policy condition with reference to notice was violated. This condition provides "In the event of an accident * * written notice shall be given by or on behalf of the Insured to the Company or any of its authorized agents as soon as practicable." The first formal written notice on behalf of Karen Hornbeck under the Beer policy was given by her stepfather to Raymond E. Phillips, the agent of State Farm who wrote the Beer policy, on March 2, 1961. Very shortly after the accident, on the evening of November 9, 1960, the State Farm agent Phillips was called "on the Wagner policy". By whom he was called or what was said does not appear. Phillips went immediately to the scene of the accident and began his investigation for State Farm. The next day, November 10, 1960, the investigation of the case was assigned to J. J. Cassell, a "Claims Specialist" for State Farm. In the course of the investigation, Gilbert Coonts and Myron B. Hymes, lawyers for State Farm, interviewed Karen Hornbeck in the hospital. On this visit, Coonts and Hymes were accompanied by a court reporter. It appears that on a former occasion these lawyers had represented interests adverse to Karen Hornbeck in a matter involving a prior accident. On this occasion they told her, in effect, that she could talk freely since this time "they were on her side".
After her release from the hospital, Karen Hornbeck was visited at her home by another State Farm representative, who took another statement from her. At sometime toward the middle of December, 1960, Cassell and agent Raymond Phillips visited the Beer residence and had Mrs. Beer and Karen sign an authorization entitled "Authorization for Claim Service and Non-waiver of Rights" and also a "Medical Authorization". On that occasion Mrs. Beer showed the agents a copy of her own policy with Nationwide and a copy of Mr. Beer's policy with State Farm. Sometime in January, 1961, Mr. Beer talked with a Mr. Summers, a General Agent for State Farm in Buckhannon, and informed him that he wished to confer with a claim adjustor about the accident, but no such conference took place until Mr. Cassell called on Mr. Beer on March 6, 1961 (a few days after the formal written notice), and took a signed statement. In this statement Mr. Beer explained that he had not given formal written notice prior to March 2d because he never thought about his policy applying to the accident, and that he gave it then only in the hopes that he could get some "medical expenses" benefits similar to those he had gotten from Nationwide, to help out with Karen's medical and hospital bills.
It is obvious that the purpose of the notice conditions of the insurance contract is to afford the insurance company opportunity to make timely investigation of the accident, sufficient to turn up any evidence pertinent to the liability. It is also clear in this case that such purpose was amply served by the early notice which State Farm had of this accident and the thorough investigation made in consequence thereof. State Farm contends that its investigation was based not on the Beer policy but on the Wagner policy, but points to nothing left undone which would have been done had the notice been given on the Beer policy. State Farm further contends that this court should adopt for West Virginia the strict rule that failure literally to comply with the notice conditions is not excused by actual timely notice from other sources, but cites no West Virginia authority for this position. This court deems it unnecessary *89 for it independently to research this question, because it is apparent that the most that is required by the policy condition is a written notice within a reasonable time after the accident under all of the circumstances, and certainly the facts recited are to be considered as among such circumstances.
In addition, the written notice is required by or on behalf of the "Insured", in this case, Karen Hornbeck. Karen was a young girl badly injured in the accident. Her father apparently did not fully appreciate the intricacies of the policy language with reference to its coverage of relatives, driving a car other than the insured car, and there is no showing and no reason to believe that Karen had any such appreciation. As pointed out in National Surety Corporation v. Wells (5 Cir. 1961), 287 F.2d 102, at page 107, notice requirements applying to a minor unaware of the coverage are greatly relaxed. It is the finding of this court that the notice requirements were complied with within a reasonable time under all of the circumstances. This finding renders unnecessary consideration of the contention that the notice requirements were waived. Karen Hornbeck is an insured under the State Farm-Beer policy, and that policy provides coverage.

SECTION III.
The next issue for decision in this case concerns the respective priorities and amounts of coverage afforded by the State Farm-Beer policy and the Nationwide policy:
Neither of the policies directly insures the vehicle involved in the accident, and in neither of the policies is Karen Hornbeck the named insured. The coverage in both policies is extended to Karen because of the common "omnibus" provisions covering a relative who is a member of the household of each of the respective named insureds. With respect to directness, therefore, it would seem that there is no difference in degree of remoteness of the policies to the accident, the insured or the vehicle involved. In the absence of specific and applicable policy provisions, therefore, there seems no reason to consider one of the policies primary and the other secondary. Mere difference in the effective dates of the policies provides no logical reason for so holding.
The policy provisions are remarkably similar. Differences in the wording are insufficient to justify distinction in meaning. Each policy, with reference to "other insurance", provides for proration, in accordance with the policy limits, where there is other collectible insurance, with respect to most of the covered risks. However, each excepts from the proration provisions the particular risk which was realized in this case, and provides, with reference to that risk, that the insurance shall be excess to other collectible insurance. In the State Farm policy, the excepted risk is described as that when a "non-owned automobile" is involved, and in the Nationwide policy the excepted risk is described as "the use of other land motor vehicles".
In this situation, the better reasoned cases point out that, to seize upon one of the clauses and give it effect involves a circuity of reasoning which depends for its starting and ending point upon which of the policies is first read; that the provisions are, therefore, "mutually repugnant", and that both are to be disregarded. See Oregon Auto Ins. Co. v. U. S. F. & F. Co. (9 Cir. 1952), 195 F.2d 958.
How then should the two companies share the anticipated but presently unliquidated liabilities, since, with respect to personal injury liability, one policy has an upper limit of $20,000.00 and the other $40,000.00 upon the occurrence? We have seen that each policy, by its terms, excepts this occurrence from its clauses providing proration according to policy limits, and that the excess provisions of each policy are to be read out of the policy as a matter of law. In similar situations, the numerical majority of the decided cases holds that liability should be apportioned in accordance with the policy limits. See Oregon Auto Ins. Co. v. U. S. F. & G. Co. (supra); Employers Liability *90 Assurance Corp. v. Pacific Employers Ins. Co., 102 Cal.App.2d 188, 227 P.2d 53 (1951). This so-called majority rule has the advantage of being relatively easy of application in most cases, but it has been criticised as "uncritical" in some well reasoned cases and articles. See 69 A.L.R.2d 1122, et seq. Its effect, for no very compelling reasons, is to read back into the policies apportionment provisions which the companies in the policy provisions expressly made inapplicable to the occurrence involved. As was pointed out in Cosmopolitan Mutual Ins. Co. v. Continental Cas. Co., 28 N.J. 554, 147 A.2d 529 (1959), "It is commonly known that the cost of liability insurance does not increase proportionately with the policy limits. The cost of increased limits is relatively small when compared to the cost of minimum coverage." This fact is strikingly illustrated in this case. The premium charged for the coverages of property damage liability and bodily injury liability in the two policies is exactly the same, in spite of the fact that the bodily injury liability limit in one of the policies is twice that of the other. In this situation, there would seem to be no equitable justification for requiring one of the carriers to bear a double burden with respect to a loss which is within the common maximum. It is difficult, however, to conceive a rule which would be readily applicable and still effect substantial justice at all points in the relationships between the relative coverages and the realized loss.
In Cosmopolitan Mutual Ins. Co., v. Continental Cas. Co., the New Jersey court reasoned that both companies had been fully paid for the assumptions of risks within their common policy limits, and, therefore, should bear the liabilities for those risks equally, with the company which had assumed the larger limits of liability paying any remainder after the exhaustion of the coverage limit of the lower limit policy. A similar result was reached by the court in Continental Cas. Co. v. General Accident Fire & Life Assurance Corp. (U.S.D.C.Oregon, 1959), 175 F.Supp. 713.
The court in Insurance Co. of Texas v. Employers Liability Assurance Corp. (D.C.S.D.Cal.1958), 163 F.Supp. 143, adopted a third alternative: that of prorating coverage on the basis of premiums paid for the respective policies. This approach seems to have something to be said for it in the matter of achieving substantial justice, although it does not bear analysis at all points in the relationships between realized loss and policy limits, and it may be difficult to apply where coverages of one or the other of the policies is so broad that it is virtually impossible to separate the premium paid for the particular risk involved from the others.
Chief Judge Watkins, of this court, in a well reasoned and documented opinion in the case of Maryland Casualty Co. v. Continental Casualty Co., D.C., 189 F. Supp. 764 (1960), in a factual situation considerably more involved than the one we are here considering, found that none of the three modes of treatment heretofore discussed fitted the facts in his case and exercised his equitable powers to apportion liability on general considerations of fairness. It would seem, therefore, that West Virginia is not committed to any one of the three methods of treatment heretofore discussed. Judge Watkins noted that in a relatively simple case, such as we have here, any of those three methods might achieve substantial justice. By coincidence, the second method (that of letting the companies bear the loss equally until the lower limit policy is exhausted) and the third method (proration according to premiums) achieve the same result. It would seem that this result in this case does achieve substantial justice, and this court is not obliged to choose between the two methods.
It is, therefore, the judgment and declaration of this court that the two policies in question, issued by Nationwide Mutual Insurance Company and State Farm Mutual Automobile Insurance Company, provide equal coverage for any liability which may be realized for damage to property, death and bodily injury within *91 their common policy limits, and that the Nationwide policy provides the coverage for any excess liability for death or bodily injury to the extent of its policy limits.