Martin KUNZE, Plaintiff and Respondent,

v.

STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, Defendant and Appellant,

and

American Family Mutual Insurance Company, Defendant and Respondent.

Roberta KUNZE, Plaintiff and Respondent,

v.

STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, Defendant and Appellant,

and

American Family Mutual Insurance Company, Defendant and Respondent.

Civ. Nos. 8806, 8807.

Supreme Court of North Dakota.

May 1, 1972.

Wattam, Vogel, Vogel & Peterson, Fargo, for defendant and appellant.

Greenwood, Murtha & Moench, Dickinson, for plaintiffs and respondents.

Pearce, Engebretson, Anderson, Schmidt & Thames, Bismarck, for defendant and respondent.

ERICKSTAD, Judge.

Marlin Kunze and Roberta Kunze, husband and wife, commenced separate actions against Larry D. Stang, as the administrator of the estate of Leon Stang, and Jake W. Gruebele, as the administrator of the estate of Brenda Gruebele, for injuries they suffered in an accident on July 4, 1967, while riding as passengers in the back seat of an automobile driven by Brenda Gruebele and owned by Leon Stang, who at the time of the accident was a passenger in the right front seat.

Marlin obtained a verdict in the sum of $37,000 and Roberta a verdict in the sum of $22,605.52. The judgments which incorporated these verdicts were affirmed by the majority of this court in Kunze v. Stang, 191 N.W.2d 526 (N.D.1971).

Following remittitur of the records in the two cases, Marlin and Roberta separately brought actions against the defendant State Farm Mutual Automobile Insurance Company and American Family Mutual Insurance Company, in which they asserted that the insurance companies were obligated to pay the judgments because they had previously issued automobile poli-

cies to Jake Gruebele, under the terms of which coverage was extended to his daughter Brenda Gruebele.

The insurance companies each filed answers denying liability.

State Farm's specific defense is "that the vehicle involved in the accident was neither described in said policy of insurance nor could it qualify as a non-owned automobile since it was furnished or available for the frequent or regular use of the alleged driver, Brenda Gruebele."

American Family's defense, although stated more generally, was to the same effect in that it denied liability, on the ground that the alleged losses described in the plaintiffs' complaints were not covered by its policy of insurance.

American Family also asked that if it should be determined obligated under the terms of its policy, any sum awarded to the plaintiffs be assessed pro rata between it and State Farm.

The facts are that Jake Gruebele and his wife, Erna, had three automobile insurance policies in effect at the time of the accident on July 4, 1967. The automobile owned by Leon Stang and driven by Brenda on the fateful evening was a 1966 Caprice Chevrolet. Leon had no insurance on this vehicle.

The policy with American Family described a 1956 Chevrolet automobile and provided bodily-injury liability of $15,000 for each person and $30,000 for each occurrence.

They had two policies with State Farm. One policy described a 1960 four-door Chevrolet and provided bodily-injury liability of $50,000 for each person and $100,000 for each accident. The other policy described a 1967½-ton Chevrolet pickup truck and provided bodily-injury liability of $100,000 for each person and $300,000 for each accident.

Under State Farm's policies coverage is extended to non-owned automobiles which are not furnished or available for the frequent or regular use of the named insured, his spouse, or any relative of either residing in the same household. American Family's provision relative to this matter did not contain the word "frequent".

The jury brought in a special verdict to the effect that at the time and place of the accident on July 4, 1967, Leon Stang's car was not available to or used by Brenda Gruebele as part of a regular or frequent use.

State Farm appeals to this court from a judgment dated November 12, 1971, holding the insurance companies liable under their policies of insurance.

At the close of the plaintiffs' case, State Farm moved for a dismissal of the actions under Rule 41(b) of the North Dakota Rules of Civil Procedure, upon the ground that the plaintiffs failed to show that the automobile involved in the accident, owned by Leon Stang and driven by Brenda Gruebele, was not available or furnished for the regular or frequent use of Brenda Gruebele. This motion was denied. At the close of all the evidence, when both parties had rested, State Farm moved for a directed verdict on the grounds earlier stated in its motion to dismiss. This motion, made in March of 1971, preceded the change in Rule 50(a), North Dakota Rules of Civil Procedure, which became effective on August 1, 1971. This motion was also denied.

State Farm contends on appeal that the facts clearly demonstrate that Leon Stang's automobile was furnished or available for the frequent or regular use of Brenda Gruebele prior to the accident, and that accordingly Brenda was not covered by her father's insurance policies with State Farm at the time of the accident, and that therefore the complaints should be dismissed as a matter of law.

The facts are that from the latter part of March to July 4, 1967, Brenda Gruebele and Leon Stang were dating regularly and that Brenda spent almost every weekend during that interim visiting Leon at his

farm home about fourteen miles southwest of Regent, North Dakota. Brenda lived during the week with her parents on their farm near Burt, North Dakota, which is twenty-five miles from Mott, North Dakota. Each day during the week Brenda drove from her parents' farm to Mott, where she was employed by Frances Senn in her beauty parlor. On a number of occasions in the interim from the latter part of March to July 4, 1967, Brenda used Leon's 1966 Caprice Chevrolet automobile to return to her home from her weekend visit at the Stang farm, and used it during the week to drive to and from her employment in Mott, and used it at the end of the week to drive from her parental home to the Stang farm for the weekend visit with Leon.

The last time Mr. and Mrs. Gruebele saw Brenda was on the Friday preceding Tuesday, July 4, 1967. Brenda spent that weekend and Monday night, July 3, at the Stang farm. On July 4, Brenda and Leon met the plaintiffs at a gathering near Regent, North Dakota. Toward the evening of July 4, 1967, the plaintiffs and Brenda Gruebele and Leon Stang decided to drive to Mott, North Dakota, to purchase hamburgers. When the group left for Mott, Leon was driving the Caprice. Two or three miles before the accident, Brenda took over the driving.

Mr. Jake Gruebele, Brenda's father, testified that Brenda used Leon's automobile a quarter of the time or more from the end of March to July 4, 1967.

Leon's brother, Larry Stang, who farmed with Leon but lived across the road approximately four or five hundred yards from the house where Leon lived, testified that he knew that Leon let Brenda use the Caprice on two occasions.

Mrs. Lorraine Stang, Leon's mother, with whom he lived testified that Brenda used the car on three or four occasions during the interim.

Mrs. Donna Rustan, Leon's sister, who from January to July 4, 1967, worked during the week for an aunt who was recuperating from surgery on a farm about four miles from her mother's farm, and who spent the weekends at her mother's farm, testified that she saw Brenda drive Leon's car four or five times during that period of time. She said that Leon took Brenda home "practically always". She admitted that Brenda sometimes stayed at the Stang home over Sunday evening, so that she (Donna) sometimes had to leave for work at her aunt's farm before Brenda left for her home.

Roberta Kunze testified that she saw Brenda drive Leon's car only once before the accident.

Mrs. Frances Senn, who operated the beauty parlor in Mott where Brenda was employed, testified that she never saw Brenda drive Leon's car at any time.

Mr. McCarty, an investigator for State Farm, testified that he took a tape recording of an interview with Mrs. Senn in her beauty parlor in Mott on July 21, 1967, at which time she said that Brenda used Leon's car "quite a bit". Mrs. Senn, however, denied that she had ever made such a statement to Mr. McCarty.

Mrs. Jake Gruebele, Brenda's mother, testified that Brenda used Leon's car "quite a bit". She also testified that Brenda used his car "about half the time".

■ On appeal to this court, State Farm asserts first that the plaintiffs have the burden of proving that the Stang automobile was not "furnished or available for the frequent or regular use" of Brenda Gruebele. Chronister v. State Farm Mutual Automobile Insurance Company, 72 N.M. 159, 381 P.2d 673 (1963); Neal v. United States Fire Insurance Company, 427 S.W.2d 676 (Tex.Civ.App., Corpus Christi, 1968); Boedigheimer v. Taylor, 287 Minn. 323, 178 N.W.2d 610 (1970); 21 Appleman, Insurance Law and Practice, § 12094; Couch on Insurance § 45:1065 (2d ed. 1966).

In *Boedigheimer*, the supreme court of Minnesota, in a 1970 decision said:

"Although there is authority to the contrary, we think the better view is that the party claiming coverage under the non-owned automobile provision of the insurance policy has the burden of proving that such automobile was not 'furnished or available for the regular or frequent use of the named insured.' The provision for coverage of non-owned automobiles is inserted in automobile liability insurance contracts as a convenience to the insured. Such coverage must be restricted in order to prevent the insured from driving any number of additional automobiles and claiming coverage for all of them. Therefore, we hold that in order for the claimant to establish prima facie coverage under the non-owned automobile provision, he must prove not only the existence of the contract but also compliance with the requirements of the non-owned automobile provision. A prima facie case for coverage of a non-owned automobile is not established merely by showing that the insured used a non-owned automobile." Boedigheimer v. Taylor, 287 Minn. 323, 178 N.W.2d 610, 614 (1970).

We believe that Minnesota has stated the proper rule and, as the trial court so advised the jury, we have no problem with this rule in the instant case.

State Farm further refers us to a quotation from a part of Section 45:1054, Couch on Insurance 2d, which we enlarge to include the following:

"It has been declared that there is no precise definition of what constitutes 'regular use' within the phrase 'furnished for regular use,' as used in the exclusionary provision of a liability policy covering the use of other cars, and that each case must be determined on the basis of its own facts. Where the evidence is conflicting the question whether a particular vehicle was furnished for regular use within the meaning of an exclusionary clause may be for the jury.

"The phrase 'not furnished for the regular use' of any person is to be given its plain, ordinary meaning, which is simply that the insured was not covered by the policy on the insured vehicle if he was injured in some other car which he could regularly use.

"The test whether an automobile is furnished for 'regular' use within an exclusionary clause is not necessarily the frequency or regularity of its use, although an infrequent and casual use by special permission on particular occasions may not constitute a furnishing for regular use. It is the nature of the use for which the vehicle is intended and to which it is put, rather than the actual duration of use, which is significant.

"There is authority which finds in the phrase 'regular use' two aspects of regularity: the one being the regularity of use by the particular person, and the other the regularity with which it was put to use for the particular purpose. Otherwise stated, an automobile by this view is not to be deemed furnished for regular use unless it is regularly being used by the person for whom it is furnished and for a purpose for which it is regularly to be used.

\*     \*     \*     \*     \*     \*     "

13 Couch on Insurance 2d, § 45:1054, p. 69.

The foregoing quotation demonstrates that there have been at least two meanings given to the phrase "furnished for regular use".

This brings us to State Farm's first crucial contention, and that is that the facts in this case establish as a matter of law that the Stang vehicle was "furnished or available for the frequent or regular use" of Brenda Gruebele. It cites in support of that proposition American Casualty Company v. Lattanzio, 78 N.J.Super. 404, 188 A.

2d 637 (1963); Moutry v. American Mutual Liability Insurance Company, 35 Wis.2d 652, 151 N.W.2d 630 (1967); Hartford Accident and Indemnity Company v. Hiland, 349 F.2d 376 (7 Cir. 1965); Mann v. Preferred Risk Mutual Insurance Company, 14 Utah 2d 282, 382 P.2d 884 (1963).

■ *American Casualty*, a decision of the Chancery Division of the Superior Court of New Jersey, held that the facts therein did not establish as a matter of law that the vehicle was "owned by or furnished for the regular use of the named insured or any relative." The following quotation from that decision is pertinent:

"Obviously, the determination in a particular case of whether the insured was driving a non-owned automobile which had been furnished for his regular use, and thus was excluded from the coverage afforded by his insurance policy, must be controlled by the factual situation presented. No hard or fast rule for the solution of the question appears to have been applied in the cases cited by counsel and none appears in the additional cases which have come to the court's attention." American Casualty Co. v. Lattanzio, 78 N.J.Super. 404, 188 A.2d 637, 640 (1963).

Also pertinent is the following from *American Casualty*:

"Having in mind the intent and purpose of the clause in question, the issue to be determined is (1) whether the use of the car which the insured was driving was furnished to him, and (2) if so, whether it was furnished for his regular use. * * * Implicit in the use of the quoted word [furnished] is the necessity for some prior arrangement or understanding concerning the use of the vehicle. Such an arrangement could be in the form of a blanket permission to use the vehicle generally or to use it for a specific purpose. Evidence as to the past history of the use of the automobile is of assistance in determining whether there was such an arrangement, but it is the condition which obtained at the time of the accident which governs, and evidence of the past use of the automobile must be related to this date. A requirement that specific authorization be obtained as a prerequisite to the use of the vehicle would sustain a finding that it was not 'furnished' for his regular use. Likewise, evidence that the insured was without access to the vehicle or the keys required to operate it, would constitute strong evidence to the same effect. Assuming that the vehicle was furnished to him, it would remain to be determined whether it was furnished for his regular use. If the use for which the vehicle was furnished was an irregular, infrequent or casual one, it would not come within the exclusionary clause and hence would be covered by the policy." American Casualty Co. v. Lattanzio, 78 N.J. Super. 404, 188 A.2d 637, 641 (1963).

*Moutry*, a 1967 decision of the Supreme Court of Wisconsin, holds that it was proper for the trial court to order a judgment of dismissal of plaintiff's complaint on the pleadings and affidavits, thus supporting the trial court's conclusion that the facts disclosed as a matter of law that the vehicle involved was furnished for the regular use of the insured. The Wisconsin supreme court in so holding said:

"* * * if the material facts are not in dispute and the inferences which may reasonably be drawn from such facts lead to but one conclusion, only a matter of law is presented which should be decided upon the motion for summary judgment." Moutry v. American Mut. Liability Ins. Co., 35 Wis.2d 652, 151 N. W.2d 630, 632 (1967).

The facts in *Moutry*, however, distinguish it from this case, in that the driver in *Moutry* apparently had unrestricted use of the vehicle for a number of weeks during the time that the owner of the vehicle was ill, notwithstanding that the driver merely used the vehicle to drive the owner's regular passengers to their place of employment.

In *Hartford,* the United States Court of Appeals for the Seventh Circuit reversed a decision of the district court and concluded as a matter of law that the car involved was "furnished for the regular use" of the insured. In that case, O'Toole, a resident of Indiana who had been visiting his family in Pennsylvania, traded cars temporarily with his sister so that he drove her 1959 Ford Thunderbird back to Indiana and left his 1957 Ford with her. Prior to the time of this trade, O'Toole had been returning to Pennsylvania about once a month. At the time of the trade, his sister told him to return the car as soon as possible. Because of business and social obligations, O'Toole did not return to his family home between April 17, 1960, and June 18, 1960, the date on which he was involved in an accident in Indiana while driving the Thunderbird. The trial court was of the opinion that because he was driving the Thunderbird for his sister's benefit, ostensibly to break it in, the Thunderbird was not furnished for his regular use. The Circuit Court reversed, saying:

"While the purpose for which the vehicle was supplied may be a relevant factor in determining whether it was for the insured's regular use, Farm Bureau Mut. Automobile Ins. Co. v. Marr, supra [128 F.Supp. 67 (D.N.J.1955)], the factor of motive bears no necessary relation to the risk assumed by the insurer under the policy, as do the factors of length and type of use, and it cannot be the controlling factor in the case before us." Hartford Accident & Indemnity Company v. Hiland, 349 F.2d 376, 378 (7 Cir. 1965).

In *Mann,* in a half-page opinion the supreme court of Utah affirmed the trial court's dismissal of the plaintiff's action. The facts therein were summarized by the chief justice as follows:

"The conceded evidence showed that plaintiff used his cousin's truck to haul hay for the latter's horses, and to go to work whenever he wished. He had ac-cess to the truck at times when it was not being utilized by his cousin, the key being left in the ashtray for his use. This custom had persisted for at least 6 months to a year, and plaintiff's insured car was available at this time for himself and/or his wife." Mann v. Preferred Risk Mutual Insurance Company, 14 Utah 2d 282, 382 P.2d 884, 885 (1963).

We need not discuss *Mann* in detail in relation to the instant case to note that *Mann* is clearly distinguishable on the facts alone.

It is our view that the trial court properly denied the motion for dismissal at the close of the plaintiffs' case and the motion for a directed verdict at the close of all the evidence. See State Farm Mutual Automobile Insurance Company v. Bates, 107 Ga.App. 449, 130 S.E.2d 514 (1963); State Farm Mutual Automobile Insurance Company v. Hench, 171 So.2d 11 (Fla.1965).

In *Bates,* the insured was an Air Force sergeant at Turner Air Base at Albany, Georgia. He tested and calibrated various equipment at Turner and on occasions took equipment to Warner Robins Air Base, a distance of approximately 100 miles away for testing and calibration. When going to Warner Robins, he drew a car from the air base motor pool. He began making the trips in October of 1960, and the accident upon which the damage suit was predicated happened on April 3, 1961. He testified that he made the trip to Warner Robins between ten and eighteen times within that period. Notwithstanding these facts, the court held that whether the vehicle involved in the accident was furnished the insured for regular use was a question of fact to be determined by the jury.

In *Hench,* the legal title to the vehicle which the insured drove was in the name of the insured's mother, and the equitable title belonged to his brother who was in the armed forces and who had informed the insured and his wife they could use the car at any time; the custody of the car was in his mother, who did not drive and

who permitted them to use it when they needed it, and it was available for the insured's use and he did use it occasionally from November 19, 1962, to the time of the accident in February 1963, in going to and from work and taking a brother to a doctor for treatment. Hench sought coverage under a policy of insurance issued to his wife and describing another vehicle. Under that policy the named insured was defined to include the spouse of the named insured. The district court of appeal of Florida held it was error for the trial court to grant summary judgment.

The next contention made in State Farm's brief is that its motion for directed verdict should have been granted because there was no evidence that Brenda Gruebele's use of the Stang car at the time of the accident was a "special use", of a "different nature", that was "specifically authorized" for "one occasion".

■ This contention apparently arises out of the following instruction given the jury:

"The phrase 'furnished or available for regular or frequent use' as applied to this case, does not imply the manner of use, that is, putting the automobile to the same uses to which Brenda Gruebele would use her own automobile, but implies a right to or opportunity for the regular or frequent use of the automobile in the sense that there was an express or implied understanding with Mr. Stang that Brenda Gruebele would have the use of that vehicle at such times as she desired, if available. Thus if you should find from the evidence and these instructions that Brenda Gruebele had such an express or implied understanding with Leon Stang that she could use the Stang automobile at such times as she desired, including the time of the accident, then you may find that the Stang automobile was used by Brenda Gruebele on a frequent or regular basis. The phrase 'furnished or available for the regular or frequent use' may not apply in

this situation if you find from the evidence and these instructions that at the time and place of the accident the vehicle was being used at a time, place and area not previously contemplated involving a purpose different than any previous purpose or use and which involved special permission of Mr. Stang granted by him for such specific occasion only. In such event you may find that the vehicle was not being used by Brenda Gruebele on a frequent or regular basis insofar as its use at the time of this particular accident."

This instruction apparently comes from the trial court's adoption of the philosophy applied in Pacific Automobile Insurance Company v. Lewis, 56 Cal.App.2d 597, 132 P.2d 846 (D.C.A.Calif.1943); and Palmer v. Glens Falls Insurance Company, 58 Wash.2d 88, 360 P.2d 742 (1961). Let us turn briefly to an analysis of those opinions.

In *Pacific Automobile*, a Mr. Wells was one of six or seven new-car salesmen employed by an automobile sales agency in San Diego. Wells and two other salesmen did not own demonstrators, while the other salesmen did. The agency furnished two cars for the use of the salesmen which were called house demonstrators, and while these were primarily for the use of salesmen who did not own demonstrators they were at times used by all of the salesmen. Three other cars which were set aside for the use of the owners and the sales manager were also available at times for demonstration purposes. Wells used all of these cars at times and sometimes borrowed the demonstrators owned by the other salesmen. It was not uncommon for Wells to use one of his employers' cars, including the demonstrators, for his personal use during the daytime, and some half dozen nights a month when he worked late he would take one of the demonstrators home with him. On some occasions when he had a demonstrator at home, he would later take it out for his personal use. He testified, however, that prior to the trip in

question, he had never taken an automobile belonging to his employers away from the vicinity of San Diego. A few days before May 11, 1941, Wells asked the sales manager if he might have the use of an automobile to drive to Pomona on a personal matter on May 11. He was told that it could not then be determined whether a car would be available at that time. On the evening of May 10, he repeated this request and was advised that Mr. Smith, one of the employers, had returned the house demonstrator that he was using and that Wells might take that car. As Wells was driving the car to Pomona the next day for the purpose of making a personal visit, the accident occurred which gave rise to this litigation.

In concluding that the trial court was correct in its finding that the automobile in question was not furnished to Mr. Wells for his regular use, the district court of appeal of California said:

"Whether an automobile is furnished by another to an insured for his regular use may reasonably depend upon the time, place and purpose for which it is to be used. One furnished for all purposes and at all times and places would clearly be for his regular use. One furnished at all times but strictly for business purposes alone could hardly be said to have been furnished for his regular use at a time and place when it was being used for personal purposes. It may be assumed that when a car is furnished all of the time for business purposes, with permission to use the same for incidental personal purposes, all within a certain area, the car might be said to be furnished for regular use within that area. But when a car thus furnished for such a use is driven to a distant point on one occasion, with the special permission of the one furnishing the car, that particular use would hardly seem to be a 'regular use' of the car. It cannot be said, as a matter of law, that such a use on a particular occasion, which is a departure from the customary use for which the

car is furnished, is a regular use within the meaning of these clauses of the policies." Pacific Automobile Ins. Co. v. Lewis, 56 Cal.App.2d 597, 132 P.2d 846, 848 (D.C.A.Calif.1943).

In *Palmer,* the plaintiff had borrowed his son-in-law's 1956 Chevrolet automobile and used it regularly in his business for over two months. On July 21, 1959, the plaintiff informed his son-in-law that the borrowed automobile was in need of repairs and the son-in-law specifically authorized the plaintiff to repair the automobile at a repair shop on 15th Avenue North and East Republican Street in Seattle. On the way to the shop the next day the plaintiff collided with a Seattle City truck. The Washington court stated the issue as follows:

"Our question is: Does the existence of a regular use of a borrowed automobile, which brings it under the exclusionary clause, preclude the possibility of a special use that is not within it?" Palmer v. Glens Falls Insurance Company, 360 P.2d 742, 743 (Wash.1961).

In concluding that the reasoning in *Pacific Automobile* was sound, the court said:

"An agreement for a regular use of an automobile does not, in fact, preclude a special use of a different nature if it is specifically authorized for one occasion only. A major repair, which may or may not be necessary in any particular automobile and which is unpredictable, is not ordinarily part of an agreement for regular use. It might very well fall outside the general authorization for the automobile's use and require special authorization as was, in fact, given in this case. The use of the automobile at the time of the collision was not *regular* within the meaning of the exclusionary clause." Palmer v. Glens Falls Insurance Company, 360 P.2d 742, 743 (Wash.1961).

A number of states seem to have adopted the California approach. In a 1961 deci-

sion the supreme court of Arkansas, in saying that it thought the better view was expressed in *Pacific Automobile,* quoted with approval the signposts stated in Farm Bureau Mutual Automobile Ins. Co. v. Marr, 128 F.Supp. 67, 70 (N.J.1955).

" '1. Was the use of the car in question made available most of the time to the insured?

" '2. Did the insured make more than mere occasional use of the car?

" '3. Did the insured need to obtain permission to use the car or had that been granted by blanket authority?

" '4. Was there a purpose for the use of the car in the permission granted or by the blanket authority and was it being used for such purpose?

" '5. Was it being used in the area where such car would be expected to be used?' " Travelers Indemnity Company v. Hyde, 232 Ark. 1020, 342 S.W.2d 295, 298 (1961).

In a 1955 decision, the court of appeals of Kentucky approved the trial court's submission to the jury of special verdicts inquiring whether the cars involved were used interchangeably or only with permission. Kentucky Farm Bureau Mutual Insurance Company v. Hill, Ky., 278 S.W.2d 729, at 731 (1955).

The signposts apparently first cited by the United States District Court in New Jersey have been adopted and applied in other states. See especially Bringle v. Economy Fire & Casualty Company, 169 N.W.2d 879 (Iowa 1969).

■ We believe that the signposts and the instructions given by the trial court in the instant case are consistent and that therefore it was not error for the trial court not to grant the motion for directed verdict and that it was within the jury's province to answer the special verdict as it did, inasmuch as it could reasonably have concluded from the testimony that the use

made of the Caprice by Brenda Gruebele on the fateful night was different from the use that she normally made of the vehicle in securing transportation to her home and to her employment between weekends with her friend.

■ Contentions three through eight in State Farm's brief are related to and determined by the conclusions we have already drawn. We see no benefit in discussing those contentions. We would comment, however, that if it was error for the court to underline a part of the instructions in this case, it was harmless error as there existed only one basic issue and that was the issue that the trial court underlined.

"RULE 61

"HARMLESS ERROR

"No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties." North Dakota Rules of Civil Procedure.

■ Contention number nine, which is the last contention raised by State Farm in its brief, is that the trial court erred in making findings of fact and conclusions of law, prorating the judgment between the defendant State Farm and the defendant American Family.

The trial court determined that State Farm was responsible for paying 90.9090 percent and American Family was responsible for paying 9.0909 percent of each of the two judgments. The court reached

this conclusion by adding the two State Farm policies, which provided a maximum of $50,000 and $100,000 in coverage per person, together with the American Family policy, which provided a maximum of $15,000 coverage per person, and then prorating the $15,000 American Family policy to the $165,000 sum.

State Farm concedes that at one time a numerical majority of the courts favored the simpler device of prorating according to liability limits, which is the device which was applied in this case. It asserts, however, that proration according to liability limits is inappropriate where the application results in an excessive disparity in liability between insurance companies, for the reason that the cost of liability insurance does not increase proportionately with the policy limits. It further asserts that courts have recognized this and that there is a general trend away from prorating according to the policy limits.

It recommends that this court adopt the method of prorationing applied in Nationwide Mutual Insurance Company v. State Farm Mutual Automobile Insurance Company, 209 F.Supp. 83 (N.D.W.Va.1962).

In *Nationwide,* as well as in the instant case, each policy, with reference to "other insurance", provides for proration, in accordance with the policy's limits, when there is other collectable insurance, with respect to most of the covered risks. However, each excepts from the proration provisions the other car or non-owned automobile risks and provides with reference thereto that the insurance shall be excess to other collectable insurance.

*Nationwide* went on to conclude that under such circumstances the provisions providing that the respective policies shall be excess to other collectable insurance are mutually repugnant and to be disregarded.

In *Nationwide,* one policy had an upper limit of $20,000 and the other had an upper limit of $40,000 upon each occurrence.

After discussing three approaches adopted by the courts, the court in *Nationwide* required the companies to bear the liability equally within their common policy limits, with the company which had assumed the larger limits of liability paying the remainder. Pertinent is the following from *Nationwide:*

"In similar situations, the numerical majority of the decided cases holds that liability should be apportioned in accordance with the policy limits. See Oregon Auto Ins. Co. v. U. S. F. & G. Co. (supra) [195 F.2d 958]; Employers Liability Assurance Corp. v. Pacific Employers Ins. Co., 102 Cal.App.2d 188, 227 P.2d 53 (1951). This so-called majority rule has the advantage of being relatively easy of application in most cases, but it has been criticised as 'uncritical' in some well reasoned cases and articles. See 69 A.L.R. 2d 1122, et seq. Its effect, for no very compelling reasons, is to read back into the policies apportionment provisions which the companies in the policy provisions expressly made inapplicable to the occurrence involved. As was pointed out in Cosmopolitan Mutual Ins. Co. v. Continental Cas. Co., 28 N.J. 554, 147 A.2d 529 (1959), 'It is commonly known that the cost of liability insurance does not increase proportionately with the policy limits. The cost of increased limits is relatively small when compared to the cost of minimum coverage.' This fact is strikingly illustrated in this case. The premium charged for the coverages of property damage liability and bodily injury liability in the two policies is exactly the same, in spite of the fact that the bodily injury liability limit in one of the policies is twice that of the other. In this situation, there would seem to be no equitable justification for requiring one of the carriers to bear a double burden with respect to a loss which is within the common maximum. It is difficult, however, to conceive a rule which would be readily applicable and still effect substantial justice at all points

in the relationships between the relative coverages and the realized loss.

"In Cosmopolitan Mutual Ins. Co. v. Continental Cas. Co., the New Jersey court reasoned that both companies had been fully paid for the assumptions of risks within their common policy limits, and, therefore, should bear the liabilities for those risks equally with the company which had assumed the larger limits of liability paying any remainder after the exhaustion of the coverage limit of the lower limit policy. A similar result was reached by the court in Continental Cas. Co. v. General Accident Fire & Life Assurance Corp. (U.S.D.C.Oregon, 1959), 175 F.Supp. 713.

"The court in Insurance Co. of Texas v. Employers Liability Assurance Corp. (D.C.S.D.Cal.1958), 163 F.Supp. 143, adopted a third alternative: that of prorating coverage on the basis of premiums paid for the respective policies. This approach seems to have something to be said for it in the matter of achieving substantial justice, although it does not bear analysis at all points in the relationships between realized loss and policy limits, and it may be difficult to apply where coverages of one or the other of the policies is so broad that it is virtually impossible to separate the premium paid for the particular risk involved from the others." Nationwide Mut. Ins. Co. v. State Farm Mut. Auto. Ins. Co., 209 F. Supp. 83, 89, 90 (1962).

State Farm would have us adopt the method of prorationing borrowed from *Cosmopolitan* and adopted in *Nationwide*.

In our case, however, we have a further complexity arising out of the fact that State Farm has been paid premiums on both its $50,000 policy and its $100,000 policy, which fact would receive no consideration under the prorationing adopted in *Cosmopolitan*.

We are unpersuaded by the arguments urged upon us today by State Farm. Accordingly, we approve the rule applied by the trial court, which is the rule that both insurance companies in the instant case apply to other risks. If it is fair as to other risks, it would seem that it should be fair as to these risks. In any case, it is workable and understandable, and, until we are otherwise convinced, we approve of it.

In support of this approach are many decisions, including recent decisions, from both federal circuit courts and state appellate courts. Wolverine Insurance Company v. State Automobile Insurance Company of Columbus, 415 F.2d 1182 (6 Cir. 1969); Motor Vehicle Casualty Company v. Atlantic National Insurance Company, 374 F.2d 601 (5 Cir. 1967); Weekes v. Atlantic National Insurance Company, 370 F.2d 264 (9 Cir. 1966); St. Paul Mercury Insurance Company v. Underwriters at Lloyds of London, England, 365 F.2d 659 (10 Cir. 1966); Liberty Universal Insurance Company v. National Surety Corporation, 338 F.2d 988 (5 Cir. 1964). See 69 A.L.R.2d 1122.

Since the issue of prorationing was raised in American Family's answer, which was properly served on State Farm, we conclude that the issue was properly before the trial court and, accordingly, have considered it upon appeal.

For the reasons stated in this opinion, the judgment of the trial court is affirmed.

STRUTZ, C. J., and TEIGEN, KNUDSON and PAULSON, JJ., concur.